[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 545.]

THE STATE EX REL. MAY COMPANY DEPARTMENT STORES, APPELLANT, *v*. INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. May Co. Dept. Stores v. Indus. Comm.*, 1995-Ohio-292.]

*Workers' compensation—Industrial Commission abuses its discretion in awarding permanent total disability compensation when evidence was omitted from the order's "evidence considered" list—Medical opinion later repudiated or equivocated upon in a later deposition is not "some evidence" supporting a commission decision.*

(No. 94-578—Submitted June 21, 1995—Decided August 30, 1995.)

APPEAL from the Court of Appeals for Franklin County, No. 93AP-354.

———————————

{¶ 1} In 1981, appellee-claimant, Margaret Wingenfeld, then thirty-two years of age, injured her back while in the course of and arising from her employment with appellant, May Company Department Stores. She never returned to work and apparently received temporary total disability compensation thereafter.

{¶ 2} On September 29, 1983, attending physician Dr. Thomas Tank wrote:

"It is my impression that this patient will not be able to return to her former occupation as a security guard at May Company, because of the potential of re-injury and bodily harm that those duties entail. I would recommend that she be placed in a job at a desk that does not involve bending, lifting over 35 pounds, prolonged standing, or prolonged sitting."

{¶ 3} On August 27, 1984, the May Company wrote Dr. Tank as follows:

"We have recently developed a new position in our security department which we believe [*sic*] Margaret Wingenfield [*sic*] may be able to do if she is released to light duty work. These positions have currently been filled, but we anticipate that further openings will be available in the near future.

"This position is as a radio operator, and I have enclosed a copy of the job description for your review.

"I would appreciate you indicating whether or not you feel Ms. Wingenfield [*sic*] would be able to perform these functions, and if so, we will make a job available to her when an opening arises.

"This job would involve very little standing, and she would be able to move about as needed for her comfort.* * *"

{¶ 4} The job description that accompanied the letter read:

"We are pleased to be able to try and bring Ms. Wingenfeld back to work at our Lorain Data Center in a position specifically suited to meet her disability (if any) as a 'Radio Room Operator.' Ms. Wingenfeld would be sitting primarily and would monitor our Honeywell security alarms, electronically securing and accessing them as needed. She would answer telephones, dispatch and coordinate detectives, guards and sometimes the monitor staff. The job would require some light typing. There would be no breaks allowed outside the room, but, naturally, comfort facilities are available on site.

"This position could accommodate Mrs. Wingenfeld either sitting or standing, whichever is more comfortable. Currently, only 20 hours per week are available though she would be required to fill in for vacations, illness, and emergencies much the same as when she worked at Great Northern. * * *

"There would be little, if any, twisting, lifting or bending required * * *[.] Ms. Wingenfeld's salary level would be maintained. * * *

"Once approval has been obtained from her physician, please contact me to make arrangements for and to coordinate her return."

{¶ 5} On June 10, 1985, Dr. Tank reported:

"She [claimant] feels she is unable to return to work at May Company because of inability to sit 8 hours a day. The job in the radio room would be in Lorain, Ohio and that is an hour's drive from her home and she is unable to drive

and sit for that distance. * * * She took the children on a field trip to Hale Farms. Walking up the gradual slope at the farms with the children caused an exacerbation of her back pain so bad that she had to spend three days in bed afterwards."

{¶ 6} In late 1988, the May Company again notified Dr. Tank of an available position:

"The position of Security Hall monitor requires no lifting or bending whatsoever. Margaret will be stationed in the entrance hall of the administrative floor in the downtown May Company Store. Her princip[al] responsibility will be to check for employee identification passes before admitting anyone through to the offices. She will also accept packages/parcels while at the same time making note of all deliveries accepted. The delivery person will drop the package in the hallway, Margaret will sign for the package and then call the department from which the delivery requires pickup. She will not be required to handle the packages themselves. She will be supplied with a stool to allow her to sit, stand, or walk in the vicinity of the hallway, as she feels necessary. She will not be required to apprehend anyone, but rather call the appropriate authorities to do so. She will be paid at a rate equal to and relative to other security agents that have been with the company since 1981 and held the same position as Margaret at the time. She will be allowed occasional breaks when necessary.

"The May Company is willing to provide Margaret with any provisions needed to meet within her restrictions, and return her into some type of gainful employment. This will hopefully return her to a more active and normal life. * * *"

{¶ 7} Dr. Tank's November 4, 1988 reply stated:

"The above named patient is sufficiently recovered from her back injury to return to work at a permanent, light-duty position compatible with the restrictions detailed in your letter of October 27, 1988. She will be able to drive to and from work, and work a 40 hour work week.

"She has a medical release from this Physician to return to work."

**{¶ 8}** Notes from a January 3, 1989 visit by claimant to Dr. Tank reported:

"[Claimant] states that after the letter [November 4, 1988 Tank letter] was written recommending that she return to a desk job watching monitors, her husband set up a work situation at home in which he placed a TV on the kitchen table and she attempted to sit at the table and stare at the monitor. After two hours, she experienced a tightening sensation in her back, spreading from the low back up to the neck. After two weeks of sitting at the monitor, she was in such severe pain that she could no longer go for therapy.

"Today, she sat at a TV from 8:00 to 10:30 a.m. She left the sitting position and went into a hot tub until noon, and then laid down until she had to come for this appointment. She has throbbing and aching in her left leg with tingling parasthesiae but no dysesthesiae. She has such severe right shoulder, arm and hand pain, that she is unable to open the hydraulic doors of the building with her right hand. * * *"

**{¶ 9}** Contemporaneous with May Company's efforts to place claimant in suitable employment, May Company hired a private investigative firm to monitor claimant. Over the next two years, investigators concluded that claimant was not gainfully employed elsewhere. They did, however, note several incidents where claimant was performing activities that may have been incompatible with claimant's reported physical symptoms. The lengthy report revealed that claimant was engaged in a very active lifestyle. She was also never observed in any apparent discomfort. At one point in 1989, claimant told an undercover investigator that:

"* * * [Claimant] will begin her workouts once school starts in late August or early September.

"We then questioned this source as to any possible work activities; she indicated that at the present time, she is not working on a full or part time basis. She stated that the entire summer has been spent with her family and she had no

4

interest in obtaining employment. The subject indicated that when school starts, she may look for some part time employment."

{¶ 10} In 1987, during the course of this investigation, claimant moved appellee Industrial Commission of Ohio for permanent total disability compensation. She accompanied her motion with a 1983 report from Dr. Tank which concluded that claimant had a thirty-five percent loss of lumbar function. It did not address claimant's ability to work.

{¶ 11} Dr. Barry Lampl reported numerous objective findings:

"All range of motion markedly limited, flexion impaired to 10 [degrees], extension to 0 [degrees], straight leg raising in the supine position to 20 [degrees] on the right and 5 [degrees] on the left. Heel and toe walking was unobtainable. Positive Patrick Fabere on the left. Deep tender reflexes diminished on the left. Decreased sensation to touch and pinprick along the lateral aspect of the left lower extremity." He concluded that claimant was unable to work.

{¶ 12} Dr. Ross J. Kovach reported:

"Examination in the recumbent position revealed that the slightest attempt at performing the straight leg raising test was stated to be excruciatingly painful. This was stated to be painful on both sides, more so on the left than on the right.

"Examination in the prone position again revealed no muscle spasm. Moderate touch to the upper, middle and lower back was stated to be painful. Skin rolling revealed no binding down of the skin of the upper or lower back. No trigger points were found upon examination.

"The Gordon toe extension and test was then performed; this was markedly positive on the left side. This test was performed with the patient in the prone position and the knee was flexed to 90 [degrees]; the toes were then moved up and down. When this maneuver was performed, Ms. Wingenfeld stated that this produced severe and excruciating pain in the lower back on the left side with no pain on the right side.

"* * *

"Physical examination of the claimant showed several discrepancies. Firstly, the straight leg raising test with pressure in the popliteal space, with tugging on the posterior tibial nerve, produced absolutely no pain. However, the same test attempt in the recumbent position was stated to be extremely painful. This does not correspond, as the identical findings should be present in both maneuvers.

"Secondly, the Gordon toe flexion and extension test as described and as performed by me, is used to determine whether or not an individual is fully truthful with the examiner. Movement of the toes up or down, in the position as described above, anatomically cannot produce any pain above the level of the knee joint. Ms. Wingenfeld stated that at this maneuver produced extreme and severe pain in the lower back.

"On the basis of this examination, it is therefore quite obvious that an element exists wherein this claimant stated that she has more difficulty than can be shown by physical examination.

"It is my opinion that she does have a permanent partial impairment on the basis of the injury which she sustained. It is also my opinion that she has been adequately compensated and, therefore, 40% permanent partial impairment is the degree of the impairment in this claim.

"Ms. Wingenfeld, in my opinion, is able to return to work immediately on a modified program such as described to me; that is, light duty type of work where she would not have to bend, lift or carry any object that is heavier than 10-15 pounds. It is my opinion that she could not return to her former position of employment as a Security Officer."

{¶ 13} Dr. Dennis B. Brooks wrote in his report:

"* * * Although she probably has some symptoms as a result of her injury and multiple operative procedures, the manner in which she describes her

6

symptoms and her performance during the physical examination clearly indicates a considerable degree of emotional overlay.

"Based on these considerations, I do not believe that Ms. Wingenfeld is permanently and totally disabled. I do believe that she is capable of performing the security hall monitor job, as I understand that position.

"I do not believe that she is capable of returning to her employment as a security guard, for I believe that neither her physical or emotional status will allow her to perform that occupation in an effective manner."

**{¶ 14}** Commission physician Dr. W. Jerry McCloud stated in his report:

"In summary, this individual does have a post laminectomy and post fusion syndrome with chronic compromise of the 5th lumbar nerve root extending into her left lower extremity. She would require a host of restrictions to protect her against progression of both her loss of lumbar motion as described, as well as the radicular and neurological changes. * * * I do not think it realistic to expect her to become productive on a sustained basis in the future.

"It is my opinion that this patient does present with medical evidence consistent with considering her permanently and totally impaired."

**{¶ 15}** In a subsequent deposition, however, Dr. McCloud retreated somewhat from his earlier opinion. Upon questioning he stated:

"[Employer's counsel:] Just so that we're clear, I am going to describe a job for you and ask you if you're able to state, based upon the examination and report that you have before you, whether or not -- whether Ms. Wingenfeld would not have been able to do this particular job.

"The principal responsibility would be to check for employee identification passes before admitting anyone through the offices. The person will accept packages and parcels while at the same time making a note of all deliveries accepted.

"The delivery person will drop the package in the hallway.  The employee—the person—in this case, let's say Ms. Wingenfeld—would sign for the package and call the department from which the delivery requires a pickup.  She would not be required to handle the packages themselves.

"She would be supplied with a stool that would allow her to sit, stand or walk in the vicinity of the hallway as she feels necessary.  She will not be required to apprehend anyone, but rather to call the appropriate authorities to do so.

"Now, Doctor, can you state from your examination whether or not Ms. Wingenfeld would not have been able to perform the job that I have just described to you?

"[McCloud:]  I'd like to give you a three-part answer, if I might.

"[Counsel:]  Okay.

"[McCloud:]  Part one would be, yes, I think she would be capable of those activities; two, I think to augment that[,] one would have to give her a clinical trial of having done so; and, three, one would have to evaluate her responses after she did make the attempt.

"It's a little bit difficult to make those estimations on a single evaluation.  But from what you described, from the evaluation, from my information that I gathered from her and from my knowledge of the problems and so forth, that would seem to be a job that she might be capable of."

{¶ 16} Caroline Wolfe, a rehabilitation counselor, noted that:

"* * * Ms. Wingenfeld has a high school diploma and had one year of college as well as training at the police academy.  Her work experience puts her in the Skilled Category."

{¶ 17} Wolfe concluded:

"Worker traits for the specific jobs which Ms. Wingenfeld has held were considered to compile her worker trait profile.  Changes were then made in this general profile to reduce her strength level from Medium to Sedentary so that she

would not lift more than ten pounds and to restrict her from the physical demands of climbing and balancing and from stooping/bending/kneeling/crouching/crawling.

"* * * A search of business listings was completed for the Cleveland Primary Metropolitan Statistical area (PMSA) which identified about 2,000 employers in the Cleveland area who might hire people to perform the occupations identified as being within Ms. Wingenfeld's physical capacities. Labor force statistics and growth projections were considered for these occupations as well as wage information.

"When the search was expanded to include generally related occupations, I was able to identify 211 occupations which are Generally Related. Finally, I considered her access to the labor market should she actually be able to work at the Light strength category as identified by Dr. Tank and was able to identify 230 occupations which are Directly Related to her previous experience."

{¶ 18} The commission granted claimant's permanent total disability application, stating in its order:

"The reports of Doctor(s) Lampl, Tank, Brooks and McCloud were reviewed and evaluated.

"This order is based particularly upon the reports [*sic*] of Doctor(s) McCloud, evidence in the file and/or evidence adduced at the hearing.

"It is noted that this claimant is 42 years of age, has a 12th grade education with one year of college and has had police academy training. Claimant's work history is that of a cashier, bookkeeper and security guard. However, this claimant has underwent [*sic*] at least three related back surgeries and was found to be PTI [*sic*] by IC Orthopedist McCloud. Therefore, with consideration given to all of these facts, this claimant is found to be permanently and totally disabled."

{¶ 19} May Company filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in

awarding permanent total disability compensation. The appellate court found that Dr. McCloud's report was "some evidence" supporting the award and denied the writ.

{¶ 20} This cause is now before this court upon an appeal as of right.

————————————

*Buckingham, Doolittle & Burroughs* and *George H. Rosin*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Janie D. Roberts,* Assistant Attorney General, for appellee Industrial Commission.

*Robert E. Sweeney Co., L.P.A.,* and *John L. Goodman*, for appellee Wingenfeld.

————————————

**Per Curiam.**

{¶ 21} Conspicuously absent from the list of evidence which, according to the commission's order, was considered by it are: (1) the deposition transcript of Dr. McCloud, (2) the investigative summary with videotapes, (3) Dr. Kovach's report, and (4) the Wolfe vocational report. In *State ex rel. Fultz v. Indus. Comm.* (1994), 69 Ohio St.3d 327, 329, 631 N.E.2d 1057, we held that where, as here, evidence was omitted from the order's "evidence considered" list, the omission "* * * leads to only one conclusion—the commission either inadvertently or intentionally ignored that evidence. Because these reports could be the key to the success or failure of claimant's application, the cause must be returned to the commission for further consideration."

{¶ 22} This ignored evidence is crucial for several reasons. First, there is medical evidence that claimant may be exaggerating her symptoms. There are also two years of surveillance which show that claimant participates in a very active life style with no outward problems. There is also evidence that suggests that claimant's absence from the work force is motivated by family concerns, not her

injury. All this evidence is inconsistent with claimant's allegation of pain so incapacitating that she is unable to perform even sedentary work.

{¶ 23} Second, Dr. McCloud's deposition suggests a repudiation of his earlier opinion that claimant was incapable of *all* work. *State ex rel. Walters v. Indus. Comm.* (1985), 20 Ohio St.3d 71, 20 OBR 402, 486 N.E.2d 94, held that a medical opinion which was later repudiated or equivocated upon in a later deposition was not "some evidence" supporting a commission decision.

{¶ 24} Accordingly, the judgment of the court of appeals is reversed, and the cause is returned to the commission for further consideration and amended order.

*Judgment reversed.*

MOYER, C.J., WRIGHT, RESNICK, , PFEIFER and COOK, JJ., concur.

DOUGLAS and F.E. SWEENEY, JJ., dissent.

_____

**DOUGLAS, J., dissenting.**

{¶ 25} I respectfully dissent. I would uphold the decision of the Industrial Commission and I would affirm the judgment of the court of appeals. This case is nothing more than a "some evidence" case and when the commission finds some evidence to grant (or deny) compensation to a claimant, then the case, as far as the courts are concerned, is over. Today's decision, I believe, changes that rule.

F.E. SWEENEY, J., concurs in the foregoing dissenting opinion.

_____